**Opinion issued December 22, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00637-CR

————————————

## EX PARTE MACK WATSON, JR., Appellant

---

**On Appeal from the 263rd District Court**
**Harris County, Texas**
**Trial Court Cause No. 1640628**

---

## MEMORANDUM OPINION

Appellant, Mack Watson, Jr., challenges the trial court's order denying his application for a writ of habeas corpus. In a single issue, appellant asserts the trial court erred in denying his application for writ of habeas corpus, in which he argued that double jeopardy precludes his retrial for murder.

We affirm.

## Background

Watson pleaded not guilty to a murder for which he was indicted in 2016. A jury was empaneled on July 12, 2019 and told to return for opening arguments the following week. On July 15, 2019, the day before opening arguments were scheduled to begin, the State learned of the existence of dashboard camera video footage ("dashcam video") from a Harris County deputy constable who the State was interviewing in preparation for his trial testimony. The constable told the State during the interview there may be dashcam video of the traffic stop during which Watson was arrested shortly after the homicide. Upon calling his precinct, the constable confirmed the existence of the footage.

That same morning the State advised Watson's counsel that the dashcam video existed. The prosecutor obtained a copy of the video that day, invited Watson's counsel to watch it while a copy was made for him, and gave him the copy of the dashcam video. The State contends it had no reason to believe the dashcam video existed until then, given that the offense report did not mention the video and defense counsel never specifically requested the dashcam video. Watson asserts he requested the dashcam video during discovery.

On July 16, 2019, the trial court convened a hearing on the late-discovered evidence. The State advised the court it had contacted other agencies involved in the murder investigation and the traffic stop and found that fifteen other potentially

2

relevant videos existed. The State obtained them and produced them to Watson that day. Also during the hearing, Watson complained of the State's failure to produce "a 3-D diagram of the scene," which the State called a "Leica scan." The parties disagreed as to whether the Leica scan was actually a "scene diagram" and whether the defense had specifically requested it or been entitled to it without a specific request under article 39.14 of the Texas Code of Criminal Procedure.[1]

Regardless, it is undisputed that the State produced offense reports to Watson, that the reports specifically referred to the Leica scan, and that the State produced a

---

[1] Article 39.14 of the Code of Criminal Procedure states in pertinent part:

> [A]s soon as practicable after receiving a timely request from the defendant the state shall produce and permit the inspection and the electronic duplication, copying, and photographing, by or on behalf of the defendant, of any offense reports, any designated documents, papers, written or recorded statements of the defendant or a witness, including witness statements of law enforcement officers but not including the work product of counsel for the state in the case and their investigators and their notes or report, or any designated books, accounts, letters, photographs, or objects or other tangible things not otherwise privileged that constitute or contain evidence material to any matter involved in the action and that are in the possession, custody, or control of the state or any person under contract with the state.

> . . .

> [T]he state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged.

TEX. CODE CRIM. PRO. art. 39.14 (a), (h).

number of materials Watson's counsel requested after viewing the offense reports. The State told the trial court during the hearing that, given that the Leica scan was specifically mentioned in the offense report, the request for a "scene diagram" rather than a "Leica scan" had been construed as "a paper copy of a scene diagram." The State also said it had "tendered the entire State's file to the defense" more than once.

During the hearing, Watson's counsel requested a continuance until July 22, 2019 so he could review the newly produced materials.[2] The State opposed the continuance to July 22, 2019 because its DNA expert had travel plans that week, but the State agreed to a continuance until July 29, 2019 and provided several other scheduling options, none of which was acceptable to the defense, for commencing the trial with the same jury while giving Watson's counsel sufficient time to review the newly produced materials. For example, the State offered to allow its DNA expert, who had "nothing to do with the dash cam or any of the scene evidence," to

---

[2]     Watson's counsel said during the July 22, 2019 hearing that the Leica scan, which he had yet to view because of technical difficulties, was "very, very important to the defense" because it *could* show where shell casings landed and the bullets' trajectory, potentially pointing to another shooter. Watson argues in his appeal that "the discovery requested [went] to the very heart of the defense, i.e. where the shots came from and who was firing first from where," but his brief does not identify how the dashcam video or Leica scan was exculpatory or cite to the record in support of his argument. The State, on the other hand, contends that while the dash cam video and Leica scan were material, they were not exculpatory. Specifically, the State asserts "the dash cam tracks exactly what is in the offense report, nothing different," and the Leica scan only showed "what the scene looked like."

testify by deposition before leaving town or to testify live on July 19, 2019, so the remainder of the trial could begin the week of July 22, 2019. Watson maintained he could not question *any* witnesses before having sufficient time to review the newly discovered materials. The trial court polled the jury to determine whether trial could begin on July 29, 2019, but several jurors had conflicts on that date. Watson then said:

> At this point we don't have a jury that would be available to hear this case and we would ask for a mistrial based on the fact that we just now are getting new evidence that we have to review.

The State expressed reservations about a mistrial, but the trial court granted Watson's motion.

On July 19, 2019, Watson filed an application for writ of habeas corpus, asserting (1) jeopardy had attached because the State had acted in such a way as to cause a mistrial, causing *the court* to order one *sua sponte*,[3,4] and (2) the trial court

---

[3]   The court's findings of fact and conclusions of law confirm Watson moved for the mistrial. Watson concedes in his appeal that "the [d]efense . . . requested the mistrial. . . ."

[4]   Even though Watson had moved for the mistrial, he said in his application in the trial court that a mistrial was not necessary because the trial court had several options to allow testimony to begin July 22, 2019 or July 29, 2019. Watson said, for example, the court could have continued the case to July 22, 2019; it could have allowed the case to proceed without the State's DNA expert; it could have issued a writ of attachment for the DNA expert, ordering him to appear to testify the week of July 22, 2019; it could have allowed another DNA expert to testify in place of the unavailable one the week of July 22, 2019; it could have considered whether a deposition of the DNA expert would be feasible; it could have asked the jurors why they would be unavailable if the case was continued until July 29, 2019; it could have allowed testimony to commence on July 29, 2019 with fewer than 12 jurors;

5

should dismiss the State's indictment. In the State's response, it asserted that double jeopardy had not attached because (1) Watson had moved for the mistrial; (2) the State had not attempted to provoke Watson into seeking a mistrial and had, in fact, offered several suggestions to avoid the mistrial; (3) Watson had not previously requested the specific materials; and (4) the State had not intentionally withheld the evidence.

On July 22, 2019, the trial court convened a hearing to address issues raised in the writ application. During the hearing, Watson's counsel asserted that the State was attempting to avoid an acquittal by waiting to advise him of the dashcam video and Leica scan right before trial, and that the State interfered with the one-week continuance sought by Watson's counsel by asserting its DNA expert was not available the week Watson wanted to try the case. The trial court denied Watson's application on July 26, 2019.

The State subsequently filed proposed findings of fact and conclusions of law and a supplemental response to Watson's application for habeas corpus relief. During an August 16, 2019 hearing regarding the writ, the State "ask[ed] that the formal findings for the writ be put into the record so that the [a]ppellate [c]ourt knows [the trial court's] reasoning." The court noted it had received in the State's

---

or the court could have issued a writ of attachment and forced the jurors to make themselves available for trial on July 29, 2019.

filing "everything that was referenced in the State's proposed findings." Watson's counsel evinced his intent to file the defense's proposed findings of fact and conclusions of law the following week.

On August 26, 2019, the trial court issued findings of fact and conclusions of law that said, *inter alia,* that the mistrial was requested by Watson; that even though the State's failure to produce the dashcam videos and Leica scan was a discovery violation, the record lacked evidence that the State's conduct was intended to force the defense to seek a mistrial; and that double jeopardy did not bar a retrial. Watson obtained a certification of the right to appeal the trial court's denial of his application for habeas corpus relief and timely filed a notice of appeal.

Watson asserts on appeal that his requests for the "scene diagram" should have resulted in the production of the Leica scan, which he describes as a "high tech version of what had [already] been provided as a simple sketch." He further asserts the State should have produced the dashcam video earlier, but concedes that "once the State had confirmed the existence of a video they did contact the defense immediately." Watson asserts that given his multiple requests for the discovery materials, the State should not be allowed to retry him "at [its] leisure."

**Standard of Review**

The court of appeals reviews a trial court's ruling on a pretrial application for writ of habeas corpus for abuse of discretion. *Kniatt v. State*, 206 S.W.3d 657, 664

7

(Tex. Crim. App. 2006); *Ex parte Arango*, 518 S.W.3d 916, 923 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *Sandifer v. State,* 233 S.W.3d 1, 2 (Tex. App.—Houston [1st Dist.] 2007, no pet.). The appellate court, in reviewing a "double-jeopardy writ," must "view the evidence in the light most favorable to the trial court's ruling, understanding that the trial court is in the best position to make the evaluations necessary to this type of decision, particularly where a prosecutor's state of mind is concerned." *Harmel v. State*, No. 03-15-00586-CR, 2016 WL 2342959, at *2 (Tex. App.—Austin Apr. 27, 2016, pet. ref'd) (mem. op., not designated for publication) (citing *Ex parte Masonheimer*, 220 S.W.3d 494, 507 (Tex. Crim. App. 2007)); *see also Velasquez v. State*, No. 10-12-00354-CR, 2013 WL 3168459, at *3 (Tex. App.—Waco June 20, 2013, no pet.) (mem. op., not designated for publication) (noting that "the Texas Court of Criminal Appeals has emphasized the importance of deferring to the trial court's assessment of facts, including the prosecutor's state of mind" when determining whether prosecutor's conduct was intended to cause mistrial) (citing *Ex parte Wheeler,* 203 S.W.3d 317, 322–24 (Tex. Crim. App. 2006)). The court of appeals will "afford almost total deference to the court's findings of fact that are supported by the record, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Ex parte Crotts*, No. 01-18-00666-CR, 2019 WL 6314906, at *3 (Tex. App.—Houston [1st Dist.] Nov. 26, 2019, no pet.) (mem. op., not designated for

publication) (citing *Ex parte Amezquita*, 223 S.W.3d 363, 367 (Tex. Crim. App. 2006)). The same level of deference is afforded to rulings by the trial court on "'applications of law to fact questions' if resolving those questions turn on an evaluation of credibility and demeanor." *Crotts*, 2019 WL 6314906, at *3 (citing *Ex parte Peterson*, 117 S.W.3d 804, 819 n.68 (Tex. Crim. App. 2003), *overruled on other grounds* by *Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007)).

Generally, double jeopardy does not attach when a mistrial is granted at the request of the defense. *Ex parte Macias*, No. 08-12-00192-CR, 2014 WL 5393042, at *3 (Tex. App.—El Paso Oct. 22, 2014, no pet.) (not designated for publication) (citing *Oregon v. Kennedy*, 456 U.S. 667, 672–73 (1982)). Texas has adopted the United States Supreme Court's standard for determining whether double jeopardy attaches after a "defense-requested mistrial." *Lewis*, 219 S.W.3d at 371. That standard "bar[s] retrial after a defendant successfully move[s] for mistrial *only* when it [i]s shown that the prosecutor engaged in conduct that was 'intended to provoke the defendant into moving for a mistrial.'" *Id*. at 336 (emphasis in original) (citing *Oregon*, 456 U.S. at 679). In *Oregon,* the Supreme Court said that "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." 456 U.S. at 676. The burden is on the defense to prove the prosecution intended to cause the

mistrial.  *Ex parte Wheeler*, 122 S.W.3d 170, 171 (Tex. Crim. App. 2003).  Finally, a habeas corpus applicant must prove his double jeopardy claim by a preponderance of the evidence.  *State v. Guerrero*, 400 S.W.3d 576, 583 (Tex. Crim. App. 2013).

**Discussion**

Watson "urges [this Court] to examine this matter with logic and common sense," acknowledging that the trial court "has made findings that support the State's version of events," but asserting that "the findings by the trial court, while offering the correct legal standard, are actually not supported by logic or the record."  Watson contends that he requested the videos and Leica scan before the State's July 15, 2019 interview with the constable, and that the State's failure to produce them when first requested can only be explained

> in the kindest view . . . that the State employs prosecutors who did not know their job.  They did not know that somehow the scene diagram produced by a laser sight was still a scene diagram, or that these radical new 'dashcams' were simply not what any reasonable prosecutor could expect to be part of a discovery request.

Watson asserts the State "deliberately withheld" the videos and Leica scan and "deliberately caused" the mistrial.  He says, "[T]he panel should do more than simply accept the [trial court's] findings, but rather use its own reasoning to delve beneath them." Watson "acknowledges the difficulty in doing [so] given the [trial court's] findings but nevertheless urges it."  He does not cite any authority that supports his suggestion that this Court should or has the authority to "use its own reasoning to

10

delve beneath" the trial court's findings, and he does not address this Court's burden to view the evidence in the light most favorable to the trial court's ruling. *See Masonheimer*, 220 S.W.3d at 506. Finally, Watson asserts the State should not be allowed to "retry [him] at [its] leisure, having already put [him] through the burden [of] one trial."

The State asserts double jeopardy did not attach because it "made repeated efforts to keep the selected jury and proceed to verdict." The State further asserts it did not know about the dashcam video because it was not mentioned in the offense report, but that it produced the video as soon as it learned of its existence; that Watson could have specifically requested the Leica scan, given that the offense report produced to Watson referred to a "Leica scanner"; that nothing that was "inadvertently withheld" was *Brady*[5] evidence; and that it did not have the *mens rea* required for double jeopardy to attach under the *Oregon v. Kennedy* standard.

**The trial court's findings of fact and conclusions of law**

The trial court's findings of fact and conclusions of law support its denial of Watson's application. The findings of fact include:

---

[5] *Brady* evidence is "favorable to an accused" because it is "material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence is "material if its effective use may make the difference between conviction and acquittal." *Ex parte Taylor*, No. 12-06-00272-CR, 2007 WL 949636, at *3 (Tex. App.—Tyler Mar. 30, 2007, no pet.) (mem. op., not designated for publication). The prosecution's suppression of *Brady* evidence violates the defendant's due process rights. *Brady*, 373 U.S. at 87.

11

- "The Court granted Applicant's request for a mistrial . . . ."

- "The prosecutors do not dispute the fact that a discovery violation occurred in not making the newly discovered dash camera footage available until July 15, 2019."

- "The prosecutors' failure to sooner discover the dash camera footage was not an intentional act performed by the prosecutors with the intent to force the defense to seek a mistrial."

- "The trial prosecutor agreed to multiple continuance dates[,] even those when co-counsel would be unavailable and witness order would substantially shift due to scheduling conflicts in order to proceed to trial with the selected jury and avoid the need for a mistrial."

- "In 2016, Defense counsel was provided a copy of the offense report that referenced a 'Leica scanner.'"

- "Although Defense counsel repeatedly asked for a 'scene diagram,' he never explicitly referred to the 'Leica scan.'"

- "The prosecutors' failure to release the Leica scan was not done with the intent of causing the defense to seek a mistrial."

The conclusions of law include:

- "Because Applicant contended that he was forced to seek a mistrial due to prosecutorial misconduct, the correct standard for determining if jeopardy attached is [the *Oregon v. Kennedy* standard, which contemplates] whether the prosecutor acted with the intent to cause the defense to seek a mistrial." (Citations omitted.)

- "The discovery violation of not making the newly discovered dash camera footage available until July 15, 2019 was not orchestrated to force the defendant to request a mistrial." (Citations omitted.)

- "The delayed release of the Leica scan was not done with the intent to cause the defense to seek a mistrial, therefore double jeopardy does not

12

apply to bar retrial in this case based on its delayed release." (Citations omitted.)

- "Double jeopardy does not apply to bar retrial when the trial prosecutor did not intend to compel Applicant to move for a mistrial based on the delayed release of the footage." (Citations omitted.)

- "Retrial of this case is not barred by the double jeopardy prohibition."

**The State's mens rea**

As noted above, for double jeopardy to attach when the defense moves for a mistrial, the defense must prove the prosecutor intended to provoke the defense into seeking a mistrial. *Peterson*, 117 S.W.3d at 818. The Court of Criminal Appeals identified a non-exclusive list of "objective facts and circumstances" for the trial court to consider in assessing whether the prosecution's acts evinced a state of mind that intended to "goad" the defense into seeking a mistrial:

> 1) Was the misconduct a reaction to abort a trial that was "going badly for the State"? In other words, at the time that the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal? 2) Was the misconduct repeated despite admonitions from the trial court? 3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct? 4) Was the conduct "clearly erroneous"? 5) Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety? 6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they consistent with intentional or reckless misconduct?

13

*Id.* at 818–19 (internal citations omitted).[6] The analysis of these factors is intended "[t]o differentiate the kind of intentional goading conduct which invokes the Double Jeopardy Clause from the inevitable mistakes made during a rough and tumble trial." *Ex parte Ahn*, No. 08-14-00082-CR, 2015 WL 4940053, at *5 (Tex. App.—El Paso Aug. 19, 2015, no pet.) (not designated for publication).

The record shows that five of the six factors weigh against the attachment of double jeopardy. First, opening statements had yet to begin when the materials were produced, so the State's failure to produce the materials cannot be viewed as a "reaction to abort a trial that was 'going badly for the State.'" *See, e.g., Ex parte O'Connor*, No. 09-09-00122-CR, 2009 WL 3126254, at *6 (Tex. App.—Beaumont Sept. 30, 2009, no pet.) (mem. op., not designated for publication) (holding "the nonexistence of the prosecutor's intent to provoke a mistrial c[ould] be inferred from the objective facts and circumstances." For instance, "[t]here [wa]s little evidence

---

[6] Although the factors were first enumerated before the Texas Supreme Court adopted the *Oregon v. Kennedy* double-jeopardy standard in *Lewis*, "these factors were set out to assist in deciding claims under either the federal or state constitutional guarantees against double jeopardy and would still apply to the *Oregon v. Kennedy* analysis." *Ex parte Melton*, No. 08-14-00063-CR, 2015 WL 1850987, at *3 n.1 (Tex. App.—El Paso Apr. 22, 2015, no pet.) (not designated for publication) (citing *Ex parte Wheeler*, 203 S.W.3d 317, 323 (Tex. Crim. App. 2006)). *See also Ex parte Ellis*, No. 02-18-00215-CR, 2018 WL 6694927, at *2 (Tex. App.—Fort Worth Dec. 20, 2018, no pet.) (mem. op., not designated for publication) (noting trial court "considers [the *Peterson*] nonexclusive list of objective factors to determine the prosecutor's state of mind").

in the record that could support a finding that the State provoked a mistrial to avoid an acquittal. The mistrial was declared before testimony began."); *see also Ex parte Ellis*, No. 02-18-00215-CR, 2018 WL 6694927, at *3 (Tex. App.—Fort Worth Dec. 20, 2018, no pet.) (mem. op., not designated for publication) (opining record did not indicate prosecutor who only referred in his "very brief opening statement" to defendant's "active warrants" "had any reason to try to goad [the defendant] into seeking a mistrial").

Furthermore, an episode that occurred shortly before Watson moved for a mistrial bolsters the State's argument that it did not want a mistrial. During the July 22, 2019 hearing, the State recounted an episode that occurred on July 16, 2019, after Watson rejected the State's suggestions to reschedule its DNA expert's testimony:

> [T]he defense [counsel] came in and told the Court, after rejecting all of those [scheduling] suggestions . . . [that he] had a conversation in the elevator with someone while a jury was on the elevator and . . . [Watson's counsel] said that he wanted to . . . make the Court aware of that and asked if a mistrial would be appropriate.
>
> It was the State who said: I don't think a mistrial is appropriate. It was the State who said: I believe the defense attorney when he says the only thing he said in the presence of a juror on the elevator was that we may not be going to trial.
>
> So the State did not ask for a mistrial then, did not seek a continuance then. The State was trying to keep the jury that was empaneled, not trying to get rid of the jury that . . . was empaneled. The only party who wanted to get rid of the jury was the defense, by coming in saying is a mistrial appropriate now, the first time when he had spoken to someone on the elevator in the presence of a jury. When that didn't work out, as

15

in the record, the defense asked for a mistrial after seeing that the jurors were not . . . going to be available.

The State asserted in its response to Watson's application that, had it wanted a mistrial, it certainly would not have told the court it did not want one when Watson proposed one. As set forth above, and as the State asserted during the July 22, 2019 hearing, the State "offered multiple suggestions in order to proceed with the trial with the jury that had been chosen . . . ." Therefore, the first factor weighs against double jeopardy.

Second, the record does not reflect repeated misconduct by the State or repeated admonitions by the trial court in response to discovery violations. On the contrary, the record shows only that the day after the State learned of the dashcam video's existence and provided a copy to Watson, the trial court asked the State to determine whether any other agencies involved in the traffic stop and murder investigation had video and the State did so, promptly producing all that it found. To the extent the trial court's request could be considered an admonition – which the record does not support – there is no evidence of any other admonition regarding the production of the videos, the Leila scan, or any other materials. The second factor also weighs against double jeopardy.

The State satisfied the third and fifth factors' requirements for a "reasonable, 'good faith' explanation" and a "legally or factually plausible basis" for the discovery violation(s). The State argued in response to Watson's application that it

did not know the dashcam footage existed until the constable mentioned it while preparing to testify because it was not identified on the offense report. The State further asserted that "had [it] known there was dash camera footage, *or if dash camera footage had ever been requested by the defense*, the State would have certainly requested it." (Emphasis in original.) As for the Leica scan, the State noted Watson had never requested or filed a motion to compel the production of the Leica scan, which was mentioned "at least four times in various places throughout the offense report" that was produced in August 2016. The State further argued that "[t]he defense ha[d] always known about the existence of the Leica Scan, and importantly, he could have retrieved a copy of it himself when he went to inspect the evidence in this case." These factors also weigh against the attachment of double jeopardy.

The fourth factor is the only one that potentially weighs in Watson's favor. The State concedes that, "[s]ince [it] is imputed to know about . . . newly-discovered evidence that was in the police's custody . . . a [d]iscovery violation occurred when the newly-discovered dash camera evidence was not turned over until July 15, 2019 – the same date the State discovered the evidence existed." The trial court found, however, that notwithstanding the discovery violations, double jeopardy did not attach to Watson's indictment.

17

The final factor–whether the State acted with "inadvertence, lack of judgment, or negligence" or whether its conduct was "intentional or reckless"–calls for an analysis similar to that involving the third and fifth factors, which contemplate the reasons for the discovery violation. Watson asserts in his appellate brief that "[t]he essence of this [appeal] is the failure to timely turn over discovery" but he lacks a single citation to the record in support of his argument that the State was not "acting innocently."

The State asserts the record does not "objectively demonstrate[] that the prosecutor intended through the inadvertent failure to release the dash camera footage that she remained unaware of until July 15, to provoke the defense to seek a mistrial to avoid any sort of a potential acquittal." On the contrary, the State told the trial court and Watson it was unaware of the existence of the dashcam footage, which was not mentioned in the offense report, until a witness who was preparing to testify said such footage might exist. As soon as the State learned of the video, it alerted Watson's counsel, told him the State would burn him a copy of the footage the same day and bring it to him, and offered to let him watch the video while it was being copied. The State also told the trial court Watson had received discovery that mentioned the Leica scan multiple times but never specifically requested the scan.

The trial court said in its conclusions of law that the State's failure "to sooner discover" the dashcam footage "was not an intentional act performed by the

18

prosecutors with the intent to force the defense to seek a mistrial," and the State's failure to produce the Leica scan earlier "was not done with the intent of causing the defense to seek a mistrial." Given Watson's failure to produce evidence that the State's discovery violations were intentional or reckless, this factor also weighs against a finding that double jeopardy bars a retrial.

A case from the Beaumont Court of Appeals is instructive. In *O'Connor*, the trial court held double jeopardy did not attach to a charge against a defendant who complained of the State's failure to produce potentially exculpatory evidence until after voir dire. 2009 WL 3126254, at *6. After voir dire but before opening statements, the prosecutor advised the court and the defendant that he had just learned while preparing a witness for testimony of the existence of a videotape of the defendant from the police department. *Id.* at *1. The defendant moved for a mistrial based on the prosecutor's failure to produce the videotape earlier. *Id.* at *2. The prosecutor explained that his predecessor had been told there was no videotape of the defendant's traffic stop or field sobriety tests because the dashcam video had run out. *Id.*

However, while preparing the arresting officer involved in the case, the prosecutor learned the video had been changed and, therefore, there was video of the defendant being transported from the police department to the sheriff's office, where

she took a breath test.[7]  *Id.* at \*1–2.  The prosecutor told the court, "[B]asically, someone is negligent here. It is either our office is negligent or the officer is negligent. Either way, there is no bad faith here."  *Id.* at \*3.  The State said the video was not exculpatory but the trial court reviewed it and concluded it "was both favorable and material to the defense" and granted the defendant's motion for mistrial.  *Id.*  The defendant filed a pre-trial application for writ of habeas corpus, arguing jeopardy had attached.  *Id.*  The trial court denied the application, holding the mistrial "'was NOT granted because of intentional or reckless acts of the prosecution,' but inadvertence."  *Id.* (Emphasis in original.)

Affirming the trial court's order denying the defendant's application for writ of habeas corpus, the court of appeals stated:

> [T]he nonexistence of the prosecutor's intent to provoke a mistrial can be inferred from the objective facts and circumstances. The State claimed the first prosecutor assigned to the case asked the officer if there was a tape of the stop and field sobriety tests. That explanation is uncontradicted in this record. The officer's answer, that the stop and administration of the field sobriety tests was not recorded because the tape had run out, has not been disproved. . . . The second prosecutor explained that she relied on the note placed in the file by the attorney previously assigned to the case and explained why she did not verify the information with the officer until the lunch break on the first day of trial. There is evidence in the record from which the trial court could infer that neither prosecutor was aware of the existence of the tape prior to the trial.

---

[7]     The prosecutor said the transport from the police department to the sheriff's office was "the only thing . . . on the recording."  *Id.* at \*2.

20

The objective facts in the record support the habeas court's finding that the late disclosure was inadvertent. The prosecutor notified the trial court of the discovery violation immediately after the lunch break and before testimony began. The tape had to be retrieved from a distant location and there is no evidence that the prosecutor had an opportunity to view the tape in order to determine whether it was favorable to the defense or to the State. Thus, the habeas court could have rejected the notion that the prosecutor suddenly revealed evidence she had previously concealed in order to avoid going to trial without that evidence.

There is little evidence in the record that could support a finding that the State provoked a mistrial to avoid an acquittal. The mistrial was declared before testimony began. . . . The habeas court could rationally reject [the notion that] developments in the trial after jeopardy attached as a motive for the State to provoke a mistrial to avoid an acquittal.

The habeas court was free to accept the State's explanation for the conduct that led to O'Connor's motion for mistrial and, under the standard set forth in *Oregon v. Kennedy*, could rule that the prosecutor did not act with the intent to provoke a mistrial so as to avoid an acquittal.

*Id.* at *6. *See also Ex parte Taylor*, No. 12-06-00272-CR, 2007 WL 949636, at *1, 3–4 (Tex. App.—Tyler Mar. 30, 2007, no pet.) (mem. op., not designated for publication) (affirming trial court's denial of application for writ of habeas corpus, holding double jeopardy did not attach when defendant moved for mistrial on basis of district attorney's failure to produce letter written to parole board on behalf of State's witness, even though defendant said he would have questioned potential jurors about the letter had he known of it); *Ex parte Stewart*, No. 04-17-00249-CR, 2018 WL 1610920, at *1, 4–5 (Tex. App.—San Antonio Apr. 4, 2018, no pet.) (mem. op., not designated for publication) (affirming trial court's denial of habeas

corpus relief, finding State's "misconduct" in failing to produce contact information or updated employment information for witness was not intended to cause mistrial, even though information was produced after opening statements but before State's case-in-chief).

As in *O'Connor*, the trial court was free to accept the State's explanations for the late-produced evidence. The lower court's findings of fact and conclusions of law reflect that the trial court did accept the State's version of events, and the record supports the findings. Based on the above, we hold the trial court did not err in denying applicant's motion for writ of habeas corpus and in determining double jeopardy does not bar his retrial.

We overrule appellant's sole issue.

## Conclusion

We affirm the order of the trial court.

## PER CURIAM

Panel consists of Chief Justice Radack and Justices Lloyd and Kelly.

Do not publish. TEX. R. APP. P. 47.2(b).

22